In the Matter of the Termination of the Parent/Child Relationship of D.T., J.B., S.B. and S.B., Children and Lola Bickel, Their Parent.

**Lola BICKEL, Respondent–Appellant,**

v.

**ST. JOSEPH COUNTY DEPARTMENT OF PUBLIC WELFARE, Petitioner–Appellee.**

No. 71A03–8812–CV–371.

Court of Appeals of Indiana, Third District.

Dec. 5, 1989.

Rehearing Denied Feb. 20, 1990.

Vickie Yaser, Indianapolis, for respondent-appellant.

Bruce J. Bon Durant, South Bend, for petitioner-appellee.

## MEMORANDUM DECISION

GARRARD, Presiding Judge.

On March 7, 1988, the St. Joseph Probate Court terminated the parent-child relationship between Lola Bickel and her four children. Lola Bickel appeals the court's order and presents three issues for review:

(1) Whether Lola received the effective assistance of counsel in the termination proceeding.

(2) Whether Lola was denied a fair trial because the judge's past familiarity with the family led to a judgment based upon evidence not adduced at trial.

(3) Whether the evidence was sufficient to support the trial court's judgment terminating Lola's parental rights.

We affirm.

### Facts and Procedural History

On August 5, 1985, Lola took her six-year old daughter, J.B., to be examined by a pediatrician because she suspected her daughter had been sexually molested. The doctor's examination failed to indicate sexual molestation, but J.B., in response to questions, indicated she had been touched "where she shouldn't be touched." J.B. named two individuals who had touched her, and the pediatrician referred Lola to the welfare department.

Lola and her husband Stan, J.B.'s father, went to the office of the St. Joseph County Department of Public Welfare (hereinafter DPW). Lola informed the intake caseworker that she had sexually molested J.B. as an infant and that she recently had learned that her husband Stan was allowing J.B. to commit fellatio. At that time J.B. remained in Lola's house because Stan had moved out and was living with his parents.

A week later, however, Lola called the DPW and asked that J.B. be removed so that Stan could return to the home. J.B. was removed from Lola's custody on August 16, 1985. The other children, D.T., age 10, and the two younger sisters, ages two years and three months respectively, remained in the home. The parents began participating in therapy at the Family and Children's Center.

The DPW filed a verified petition alleging child in need of services on August 28, 1985, and asserted that all four children were in need of services. On October 2, 1985, the court found that children were in need of services. J.B. was ordered to remain in foster care; the other three children remained at home. Eight weeks later, the DPW filed a six-month review and requested that the remaining children be removed from the house because the children were at risk due to Lola's psychological problems. The court modified its original disposition. D.T. was placed in a residential treatment facility for disturbed boys, and the younger girls were placed in foster care.

On January 14, 1987, the DPW filed its eighteen-month review and the court set a hearing for February 4, 1987. Attorney Douglas Seely entered his appearance on Lola's behalf on January 30, 1987. The matter was continued for pre-trial conference to be held March 12, 1987. On March 6, 1987, the DPW filed its petition for termination of the parent-child relationship. The court heard the case on October 16, and November 19, 1987. On March 7, 1988, it issued comprehensive findings of fact and conclusions.

Motion to correct errors was filed May 6, 1988, and denied October 27, 1988.

### I.

Lola contends for the first time on appeal that she received unreasonably deficient legal representation. She contends specifically that her attorney had very little experience in juvenile matters, that he failed to make pretrial discovery, and failed to make timely objections to statutory procedures, and that he told Lola to stop cooperating

with the DPW once it had initiated termination proceedings. Lola contends this ineffective assistance is fundamental error.

Lola urges us to employ the standard used in criminal cases to evaluate counsel's effectiveness. For purposes of this opinion we will assume that standard is appropriate, given the nature of the rights terminated. *See Santosky v. Kramer* (1982), 455 U.S. 745, 102 S.Ct. 1388, 71 L.Ed.2d 599. To find that counsel was ineffective, the court must find that counsel's representation fell below an objective standard of reasonableness under prevailing professional norms and that the substandard performance was so prejudicial as to have deprived Lola of a fair adjudication. *Schiro v. State* (1989), Ind., 533 N.E.2d 1201, 1204. The result must be rendered unreliable, and the party asserting the ineffective assistance claim has the burden of showing that the decision reached would have been different absent the errors. *Lawrence v. State* (1984), Ind., 464 N.E.2d 1291, 1294.

We find that Lola has not met this burden of proof. She has not demonstrated that failure to initiate discovery in any way prejudiced her defense or that an attorney following professional norms would have done so. She has also failed to show that she would have any likelihood of prevailing on objections which she alleges her counsel failed to make. Also, counsel's alleged inexperience in juvenile matters does not render his assistance ineffective. Inexperience, isolated mistakes, poor strategy or bad tactics do not necessarily amount to ineffective assistance. *Schiro v. State, supra,* 533 N.E.2d at 1206; *Lawrence v. State, supra,* 464 N.E.2d at 1295.

The most serious claim is that Lola's counsel advised her "not to pay any more attention" to the DPW once it had initiated termination proceedings. Lola claims she relied on her attorney's admonition to her detriment; if she had remained in DPW's programs, her parental rights would not have been terminated. It is likely that counsel's remark was intended as an admonishment to protect her own interests. As we discuss later in this opinion, however, participation in DPW's programs alone does not guarantee that a court will find that a person has been a fit parent. *Matter of J.H.* (1984), Ind.App., 468 N.E.2d 542, 546. DPW had, in fact, initiated proceedings because Lola was not making progress in these programs. Lola has failed to demonstrate prejudice.

This case is analogous to the case where counsel advises a defendant to enter a guilty plea. The guilty plea defendant must show a reasonable probability that, but for counsel's errors, he would not have pleaded guilty and would have insisted on going to trial. *Burse v. State* (1987), Ind., 515 N.E.2d 1383, 1385. Here Lola must show a reasonable probability that she would have continued counselling and made the necessary improvements that would result in permanent reunification with her family. However, Lola's own testimony indicates that she felt she no longer needed the counselling and therapy and, therefore, discontinued it.

Finally, a review of the record indicates Lola's attorney vigorously objected to evidence at appropriate times and vigorously cross-examined witnesses. We must conclude that her counsel did not render deficient assistance. *Jeffers v. State* (1985), Ind., 485 N.E.2d 81, 89.

## II.

Lola also contends that the trial court erred in including in its findings three facts not offered as evidence by the DPW in its case. She argues that those facts led to the court's conclusion that her "habitual pattern of inappropriate conduct" is not in the best interest of her children and that termination of her rights would be in their best interest. She further argues that inclusion of these unproven facts indicates that the trial court was biased in the DPW's favor.

The offending findings are No. 11, which states that D.T. was declared a child in need of services under Cause No. J–5402 because Lola physically abused him; No. 13, which says that J.B.'s father and other men performed oral sex on her; and No. 8 that states that Lola's first contact

with DPW occurred in May, 1978, because of her neglect and poor supervision of D.T. No evidence in the record refers to a Cause No. J–5402, but there is evidence in the record that Lola had physically abused D.T. and had had previous contacts with DPW. No. 13 misstates the evidence insofar as it states J.B.'s father performed oral sex on her. Nevertheless, evidence in the record shows that J.B.'s father allowed J.B. to put her mouth on his genitals. Finally, there is no evidence in the record showing when Lola's first contact with DPW took place. Lola herself testified, however, that she had had previous contacts with DPW sometime between 1976 and 1978.

These errors do not render the findings completely erroneous, and even if the findings correctly state what is in the record, the court could correctly find that they lead to the conclusion that Lola's habitual pattern of inappropriate conduct was not in the children's best interest. The errors are, therefore, harmless insofar as they misstate the evidence.

 These errors also do not show that the trial judge was biased. The law presumes the trial judge was unbiased. In order to overcome that presumption, the party asserting bias must show that the trial judge has a personal prejudice for or against a party. *Lasley v. State* (1987), Ind., 510 N.E.2d 1340. Clear bias or prejudice exists only where there is an undisputed claim or where the judge has expressed an opinion on the merits of the controversy before him. *Wallace v. State* (1985), Ind., 486 N.E.2d 445, 456. In the termination proceeding situation, the judge is very likely to have knowledge of previous proceedings. The juvenile court's jurisdiction over a child in need of services or his parent continues until the child reaches his 21st birthday unless the court discharges the child and his parent at an earlier time. IC 31–6–2–3. Inadvertent references to previous proceedings not in the record will not necessarily lead to the determination that

the trial judge was biased, and we find that here they do not.

### III.

Lola argues the trial court improperly terminated her parental rights. Initially, Lola "takes exception" to alleged variations between the DPW's stated reasons for removal and the reasons for termination set forth in the trial court's ruling. She argues that DPW's petitions and the court's detention orders did not provide her with notice of all the conditions that had to be remedied to prevent termination of her rights, thus denying her due process of law. She contends that the trial court's order should be reversed to the extent it is based on unremedied conditions not alleged at the initiation of proceedings. Specifically, Lola contends that she was not informed that her meager earnings and lack of housing would subject her to the risk that her children would not be returned.[1]

 J.B. was initially removed from the home on August 16, 1985. Lola had requested J.B.'s removal on August 15 because she wanted her husband Stan to move back in. On August 21, 1985, the court at a hearing approved J.B.'s detention by the DPW as it was necessary to protect her from Stan, and Lola was unable or unwilling to take custody of her. IC 31–6–4–6(d) and (f). On August 15, 1985, the intake officer made her report of preliminary inquiry and investigation of four children. IC 31–6–4–8. The intake officer recommended that a CHINS petition be filed in juvenile court. Two reasons were given: sexual abuse and the fact that the children's physical or mental condition was seriously impaired or endangered as a result of the inability of the parent to supply the children with necessary food, clothing, shelter, medical care, education or supervision.

On August 28, 1985, the court granted the DPW authorization to file a CHINS petition, and the petition was filed the same day. All four children were alleged to be

---

1. As we discuss later, her lack of housing and low income were only two of several factors leading to the court's decision.

in need of services for the above-stated reasons. Hearing was held October 2, 1985, and the children were found to be in need of services. J.B. was to continue in detention; the other three were to remain in the home. The family was ordered to enter counselling and individual and family therapy with the Family and Children's Center. The family was to remain in the program until DPW and the therapist concurred that treatment was complete.

On November 27, a six-month review was filed. IC 31–6–4–19. The DPW requested that the October 2 disposition be modified to remove the other three children from the home because they were at risk due to psychological problems that prevented Lola from fulfilling her parental obligations. On December 4, 1985 the court approved the review and modified the disposition. The order included a case plan, see IC 31–6–4–6.6, that called for the provision of homemaker services, crisis counselling, individual and family counselling, home-based family services and transportation by the DPW. Lola was ordered to cooperate with DPW, and the summer of 1986 was the projected date for the children's return, *their adoptive placement*, or emancipation.

We conclude, based upon our review of the original CHINS adjudication and dispositions, that Lola had adequate notice that the reason for the court's adjudication was her inability to care for and provide for her children, including but not limited to her lack of income and ability to provide shelter. If her situation did not improve, she faced the possibility that her parental rights would be terminated. While it is true that J.B.'s removal from the home was initially the result of sexual abuse, it became obvious that independent of, and perhaps because of, the sexual abuse, Lola was unable to provide her four children with the care and necessities they needed. *See Matter of J.H.* (1984), Ind.App., 468 N.E.2d 542, 545. It is not necessary that new CHINS proceedings be initiated once new grounds for intervention by the DPW

are discovered. *See In re Wardship of M.H.* (1985), Ind.App., 490 N.E.2d 1119, 1122. Lola participated in the proceedings, received service of summons, and initially participated in the remedial efforts. Her notice was adequate, and assuming other procedural requisites have been met, she was not denied due process of law.

 The rest of Lola's argument amounts to a claim that the DPW did not prove by clear and convincing evidence that her parental rights should be terminated. *Santosky v. Kramer* (1982), 455 U.S. 745, 102 S.Ct. 1388, 71 L.Ed.2d 599; IC 31–6–7–13(a). In reviewing the sufficiency of the evidence, the court may not reweigh the evidence or judge the credibility of witnesses. This court may consider only that evidence favorable to the judgment. *J.K.C. v. Fountain County Department of Public Welfare* (1984), Ind.App., 470 N.E.2d 88, 91; *In re Johnson* (1981), Ind.App., 415 N.E.2d 108, 112. Nevertheless, in view of the special nature of parent-child relationships, "far more precious than any property right," courts must pay particular attention to the type of evidence used to justify the termination. *Santosky v. Kramer, supra*, 455 U.S. at 758, 102 S.Ct. at 1397, 71 L.Ed.2d at 610. For example, an adjudication that a child is dependent and neglected may not be based solely on conditions which existed in the distant past, but exist no longer. *Wardship of Bender* (1976), 170 Ind.App. 274, 285, 352 N.E.2d 797, 804.

 The trial court in this case entered comprehensive findings of fact and its conclusions thereon. Lola challenges certain of the findings of fact. The court on appeal may not set aside the findings or judgment unless clearly erroneous. TR 52(A). Of the 39 findings, we find that all are supported by testimony and evidence in the record.[2] Three findings mischaracterize that evidence, however. Finding No. 17 states that Lola continued group therapy at the Family and Children's Center until she was asked to leave because of "obstrep-

---

**2.** Findings 8, 11 and 13 contained errors, but we, nevertheless, found they were supported by

evidence. *See* § II, *supra*.

erous" behavior. Finding No. 26 states in part that the only place for the children to sleep in Lola's home was a dirty basement. Finally, finding No. 27 states that Lola refused to use proper safety seats for her children. These three mischaracterizations, however, do not render the remaining findings or the conclusions entered clearly erroneous.

 Lola challenges findings based on testimony of Thomas Balthazor, social worker, and Dr. Michael Rupley, psychologist, that Lola had a narcissistic personality and exhibited "magical thinking." We realize that psychology and sociology often do not present quantitative standards by which to judge mental health and parental ability. Often their characterizations appear imprecise and susceptible to interpretation to the reader of the evidence. Nevertheless, we do not weigh the evidence or judge witness credibility on appeal. The transcript shows that Balthazor and Rupley testified as to those conclusions and the trial court properly considered their testimony.

Lola challenges other findings, but it suffices to say all other findings of fact are supported by evidence.

 We next turn to whether the facts support the conclusions of law. To terminate parental rights, the court must find that: (1) the child has been removed from the parent for at least six months, (2) there is a reasonable probability that conditions that resulted in the removal will not be remedied, (3) termination is in the best interest of the child, and (4) the county department has a satisfactory plan for the care and treatment of the child. IC 31–6–5–4(c); 31–6–5–4.3. The children had all been removed more than six months from the home, and the DPW had submitted adoption plans for the children. Lola challenges the conclusion that she is not reasonably likely to remedy the conditions that led to removal.

Lola argues that several of the court's factors do not support the inference that the conditions have not and will not be remedied. Namely, she participated in the counselling and parenting classes until her attorney advised her "not to pay attention" to DPW. Her taking her infant son to the carnival was too remote in time to have a bearing on her current ability to parent. Her two youngest daughters will outgrow the condition that currently causes their discomfort when she smokes cigarettes. Inadequate housing and income are not sufficient grounds to terminate her parental rights. And she divorced the man who molested J.B., so he is no longer a threat to her children.

 We must be very careful not to terminate parental rights because the parents in question do not fit into a class-based notion of what a parent should be. The judiciary, prosecutors and the personnel in the welfare departments should not enforce their personal standards on those who are less well off. *Matter of Dull* (1988), Ind.App., 521 N.E.2d 972, 977 (Sullivan, J., dissenting). Lola is correct that factors such as low income or inadequate housing are by themselves not sufficient grounds to terminate parental rights. *Matter of Dull, supra*, 521 N.E.2d at 976; *Matter of Fries* (1981), Ind.App., 416 N.E.2d 908, 910. She is also correct that incidents of neglect and abuse remote in time do not alone justify termination. *Wardship of Bender, supra.* However, termination may be based on evidence of recurring incidents up until the time of removal. *Id.* Moreover, Lola is incorrect in asserting that mere participation in the DPW's programs is sufficient to show improvement in conditions, *Matter of Miedl* (1981), Ind., 425 N.E.2d 137, 141; *Matter of Dull, supra*, 521 N.E.2d at 976; *Matter of J.H., supra*, 468 N.E.2d at 546, especially when her counsellor and welfare personnel urged her to continue the programs and offered her alternative programs.

 The trial court also based its conclusion that conditions would not be remedied on an additional factor: that because of the history of sexual abuse and unstable living arrangements over the children's lifetimes, the children had special needs that the mother could not satisfy due to unstable personality and refusal to continue professional help. There is ample evidence in the findings for this conclusion.

The court need not wait until the children's physical, mental and social growth is irreversibly harmed before terminating the parent-child relationship. *J.K.C. v. Fountain County Dept. of Public Welfare, supra,* 470 N.E.2d at 93. While certain of the factors alone—Lola's smoking, inadequate housing, low income—would not justify termination of parental rights, all the factors together are substantial evidence justifying termination. *Matter of Fries, supra,* 416 N.E.2d at 910. That the children have special needs because of their history makes the conclusion more imperative.

 There is also sufficient evidence for the trial court's conclusion that it is in the children's best interest that the relationship be terminated. Children should not be taken from their parents because there is a better place for them than in the custody of their parent. They are taken because the current arrangement is "wholly inadequate for their very survival." *Matter of Miedl, supra,* 425 N.E.2d at 141. The law recognizes that some children have different and sometimes more demanding needs for their survival. *Id.* The evidence in this case clearly shows that because of the history of abuse and family instability, Lola's children need stability and special care to overcome the psychological harm already inflicted on them. Lola has proven herself unwilling or unable to meet those needs despite the efforts of various social service agencies. The DPW has gone more than the "second mile" in assisting Lola. It was not required to do any more. *Id.* The children continue to grow up quickly; their physical, mental and emotional development cannot be put on hold while their recalcitrant parent fails to improve the conditions that led to their being harmed and that would harm them further.

No error has been shown in the judgment.

Affirmed.

STATON and BAKER, JJ., concur.